**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

ANGELA LOSH,

       **Plaintiff,**

v.

                                      **Civil Action No. 1:06CV130**
                                      **(Chief Judge Irene M. Keeley)**

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

       **Defendant.**

### REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

### I. Procedural History

Angela Losh ("Plaintiff") filed applications for DIB and SSI on November 27, 2000, alleging disability beginning September 20, 1999, due to difficulty sitting, standing, and lifting; shortness of

---

[1] On February 12, 2007, Michael J. Astrue became the Commission of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

breath; and high blood pressure (R. 65-68, 88, 60508). Both applications were denied initially and upon reconsideration (R.46-50. 54-56, 610-14, 617-19). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Jay Levine held on August 20, 2002 (R. 767-806). On October 18, 2002, the ALJ rendered a decision finding Plaintiff was capable of sedentary work (R. 623-34). Plaintiff filed a Request for Review with the Appeals Council on October 23, 2002 (R. 19). The Appeals Council issued an order on January 2, 2004, granting the Request for Review. The Appeals Council vacated ALJ Levine's decision and remanded the case for further proceedings. Specifically, the Appeals Council instructed the ALJ to evaluate new and material evidence it had received from the Elkins Family Counseling Center for the period of July 18, 2002, through June 26, 2003; obtain existing updated treating source evidence concerning Plaintiff's mental and physical impairments; give further consideration to Plaintiff's maximum residual functional capacity; obtain evidence from a medical expert to clarify the nature and severity of Plaintiff's impairments, if necessary; and obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base (R. 635-37).

On August 12, 2004, Plaintiff appeared at a second hearing, which was conducted by ALJ Karl Alexander (807-40). Plaintiff, who was represented by Monti VanNostrand, and Larry Bell, a Vocational Expert ("VE"), testified (R. 392). On December 21, 2004, the ALJ issued an unfavorable decision (R. 16-30). Plaintiff filed a Request for Review with the Appeals Council, which was denied (R. 11-16), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Plaintiff was born on August 28, 1967, and was thirty-seven years old at the time of the December, 2004, decision (R. 65). Plaintiff graduated from high school and obtained her nursing

2

assistant certificate (R. 771). Her past work experience included a waitress, stocker, certified nursing assistant, and maintenance worker (R. 121).

On July 10, 1995, Plaintiff underwent a venous duplex scan, which showed no evidence of deep venous thrombosis, right or left lower extremity. Severe bilateral venous insufficiency was noted (R. 498).

On January 8, 1996, Plaintiff's lumbar spine MRI showed minimal degenerative anterior spurring and well-maintained joint spaces (R. 340).

On February 2, 1996, Plaintiff presented to Farukh Khan, M.D., with back pain and tender "LS spine." Dr. Khan's office notes read, in part, that he referred her for physical therapy and prescribed Naproxen (R. 497).

On February 14, 1996, Plaintiff's lumbar spine MRI showed "suspect[ed] mild central subligamentus herniation of disc material at L4-5 but . . . no major degree of spinal stenosis or obvious impingement on the existing nerve roots" (R. 341).

In the early part of 1996, Plaintiff had three appointments with Dr. Khan. During one appointment, Plaintiff stated she had pain down her left leg and down her right arm and into three fingers. Plaintiff stated her back pain felt like a "bee sting feeling up spine." Plaintiff also asserted she had pain between her hips. Her blood pressure was 144/112, and her weight was 209 pounds. Dr. Khan's office notes read, in part, that Plaintiff had tender lumbar spine, herniated disc at L4-5, and lumbar strain. He referred her to a specialist at "WVU" and prescribed Dopazide. During another visit, Plaintiff informed Dr. Khan she was in "a lot of pain." Dr. Khan obtained an appointment with Dr. Voelkner for Plaintiff on April 4, 1996. During a third visit, Plaintiff's blood pressure was 148/110 and her weight was 210 pounds. Dr. Khan's office notes read, in part, that he

3

recommended Plaintiff reduce her salt intake and weight (R. 496).

On March 11, 1996, Plaintiff presented to Dr. Khan with complaints of headache, neck pain, and chest pain. Dr. Khan's office notes read, in part, that he diagnosed Plaintiff with headaches and referred her to other physicians (R. 499).

On March 15, 1996, Plaintiff presented to Dr. Khan with continued back pain. She reported physical therapy did not help but that her pain medication relieved her symptoms. Plaintiff stated "Lorcet . . . [made] her dopey." Dr. Khan's office notes read, in part, that he recommended Plaintiff discontinue physical therapy and rest at home. He prescribed Darvocet (R. 497).

On April 4, 1996, Joseph L. Voelker, M.D., corresponded with Dr. Khan, relative to Plaintiff's low back and leg pain. Plaintiff informed Dr. Voelker she injured her back at work lifting a patient. She had undergone two weeks of physical therapy. Dr. Voelker noted the February 1996 MRI of Plaintiff's lumbar spine revealed a "small L4-5 central disc bulge with no root compression or canal stenosis." He recommended continued conservative treatment of physical therapy and anti-inflammatory medications (R. 257-58).

On August 22, 1996, Dr. Khan's office notes read, in part, that Plaintiff was released to return to work in April, 1996, "she tried to go back – schedule not known . . . gave up on the job." Plaintiff asserted she could not lift. She had pain in her back and legs and chest pain. Plaintiff stated she was taking Dopazide, which made her feel better. Dr. Khan diagnosed hypertension and ankle edema and continued to prescribe Dopazide (R. 494).

On September 19, 1996, Plaintiff returned to Dr. Khan for a complete physical. Her blood pressure was 140/100 and her weight was 207 pounds. She complained of tingling in the left side of her head. Dr. Khan's office notes read, in part, that he diagnosed Plaintiff with hypertension,

4

headache, and chest pain. He ordered an EKG (R. 494).

On November 26, 1996, Plaintiff reported to Dr. Khan she had almost "blacked out," she had tingling in her head, and chest pain. Dr. Khan's office notes read, in part, that he ordered an EEG and diagnosed obesity, amblyopia, and seizure disorder.

On January 1, 1997, Plaintiff's electroencephalogram showed "abnormalities over both temporal areas during wakefulness." It was recommended that a sleep recording be obtained "to elucidate this issue further" (R. 490).

On February 25, 1997, Plaintiff underwent another electroencephalogram, which showed "essentially normal tracing during wakefulness and sleep" (R. 489).

On March 27, 1997, Plaintiff presented to Dr. Khan with complaints of difficulty breathing due to a possible chest cold. Her blood pressure was 140/90 and she weighed 212 pounds. Dr. Khan's office notes read, in part, that he diagnosed Plaintiff with bronchitis, hypertension, and obesity and prescribed Proventil (R. 493).

On April 25, 1997, Plaintiff reported she inhaled bleach while working. Dr. Khan diagnosed chemical pneumonitis (R. 487).

On August 8, 1997, Plaintiff presented to Dr. Khan with complaints of her feet swelling in the afternoon. Her blood pressure was 148/96 and she weighed 202 pounds. Dr. Khan's office notes read, in part, that he diagnosed Plaintiff with hypertension, ankle edema, and obesity and prescribed Trimenter and Albuterol (R. 486).

On January 26, 1998, Dr. Khan's office notes read, in part, that Plaintiff complained of her ankles swelling and her teeth hurting. Her blood pressure was 140/96. Her weight was 196.5 pounds. Dr. Khan diagnosed hypertension, severe dental cavities, and resolved urinary tract

5

infection and prescribed Albuterol (R. 480).

On February 7, 1998, Plaintiff reported to Dr. Khan that she had been admitted to the hospital on February 6, 1998, for chest pains and shortness of breath. Plaintiff stated she felt "bruised inside" and she had no energy. Her blood pressure was 120/92 and her weight was 200 pounds. Dr. Khan's office notes reflected, in part, that he diagnosed Plaintiff with chest pain, situational stress and GERD and prescribed Triam and Albuterol (R. 478).

Plaintiff's February 11, 1998, upper GI showed "mild reflux . . . during the procedure," but produced normal results (R. 477).

On February 13, 1998, Dr. Khan diagnosed Plaintiff with GERD and cellulitis and prescribed Motrin and Keflex (R. 476).

On February 23, 1998, Plaintiff was diagnosed with left leg cellulitis by Dr. Khan, for which he prescribed a Medrol Dosepak (R. 475).

On April 29, 1998, Plaintiff presented to the Emergency Department of Davis Memorial Hospital with an acute strain of her left hand. She was provided a universal splint. She was prescribed Naprosyn and instructed to seek care with Dr. Khan or Dr. Pavlovich (R. 260).

On May 13, 1998, Plaintiff reported to Dr. Khan that she felt "lousy," she was nauseated, and she had pain in her chest. She stated she had an acute strain of her left hand and her ears were clogged. Dr. Khan's office notes reflected, in part, that he diagnosed with her pain in her left chest, prescribed Triam and Albuterol, and recommended Plaintiff reduce her smoking (R. 474).

Plaintiff returned to the Emergency Department of Davis Memorial Hospital on June 14, 1998, with complaints of anxiety "since her husband left her a couple of days ago." Plaintiff stated she had experienced panic attacks in the past and her current symptoms were "extremely similar." Plaintiff stated she was taking medication for hypertension and asthma. Plaintiff was diagnosed with

6

anxiety and prescribed Ativan (R. 261).

On June 16, 1998, Plaintiff presented to Dr. Khan with complaints of not sleeping due to her husband having left her. Dr. Khan prescribed insomnia and acute situational reaction and prescribed Lorazepam (R. 473).

On June 19, 1998, Plaintiff reported to Dr. Khan that the "nerve pills" he had provided "didn't help a whole lot." Plaintiff stated she could not sleep. Plaintiff reported her husband left her "last Friday" and then phoned her "last evening" and informed her he wanted a divorce. Dr. Khan noted Plaintiff was not suicidal or homicidal. He prescribed Halcion (R. 472).

On September 25, 1998, Plaintiff presented to Dr. Khan with complaints of heartburn, nausea, pain in neck, no energy, and pain in left side of head. Plaintiff's blood pressure was 142/90. Dr. Khan's office notes reflected, in part, that he diagnosed chest pain and bronchitis and prescribed Albuterol (R. 471).

On October 26, 1998, Plaintiff presented to Dr. Khan with complaints of sinus drainage, chest tightness, sore throat, dizziness, and back pain. Dr. Khan's office notes read, in part, that he diagnosed sinusitis and back pain and prescribed Amoxicillin (R. 470).

Plaintiff's November 4, 1998, chest x-ray showed "no radiopathology." It was compared to the October 3, 1995, chest x-ray and the appearances were similar (R. 468).

On November 4, 1998, Plaintiff presented to Dr. Khan with chest pain, shortness of breath, and heart racing. He diagnosed dyspnea (R. 469).

On March 25, 1999, Plaintiff presented to Dr. Khan with complaints of chest pain. Plaintiff informed Dr. Khan she had not been taking her blood pressure or asthma medications. Plaintiff stated her "childrens [sic] father [was] back in town – cause[d] stress." Plaintiff denied depression;

it was noted she was not suicidal or homicidal. Her blood pressure was 136/98 (R. 466).

Plaintiff was treated from April 20, 1999, through August 12, 2002, by E. Morgan Jones, D.C. (R. 347-59 529-45, 583-84).

On May 25, 1999, David Lee, Physical Therapist, completed a Work Disability Evaluation Report – Functional Capacity Evaluation of Plaintiff (R. 268-76). He opined she could work at the light strength grade level (R. 276).

On June 2, 1999, a MRI was made of Plaintiff's lumbar spine. The impression was for a bulging disc or central herniation of L4-L5, "otherwise negative MRI of the lumbar spine" (R. 277, 342).

Plaintiff underwent physical therapy for spinal conditioning at Elkins Physical Therapy Service for eight sessions, ending August 16, 1999 (R. 278).

On September 28, 1999, James Wiley, M.D., examined Plaintiff's back. He noted Plaintiff's medications were Triamterene, Skelaxin, and Darvocet. He found Plaintiff was positive for asthma, but was "in good general health otherwise" (R. 299). Dr. Wiley noted Plaintiff did not drink alcohol and did not use tobacco. Plaintiff stated she could walk 150 yards, but had to rest twice. Plaintiff informed Dr. Wiley she could drive for approximately one-half hour. Plaintiff's blood pressure was 132/84, her height was five feet, three and three-quarter inches, and her weigh was 230 pounds. Dr. Wiley noted scoliosis and antalgic lean when Plaintiff stood. He observed no lumbar hypolordosis or hyperlordosis (R. 301). Plaintiff complained of tenderness at L5 and in the left sciatic notch area and paraspinal muscle tenderness on the left. There was no paravertebral muscle spasms or sacroiliac joint tenderness. Dr. Wiley observed Plaintiff could not do a full squat. There was no loss of motor strength, but there was diminished sensation in the L5-S1 dermatome. Plaintiff's deep

tendon reflexes were active and equal in the lower extremities. Her straight leg raising test while sitting was positive on the left at 13 degrees and on the right at 24 degrees (R. 302). Dr. Wiley reviewed Plaintiff's April 23, 1999, x-rays and noted it showed sciatic scoliosis convex to the left, which was "normal." There were no transitional vertebrae. The disc spaces were well preserved and there were no subluxations. He reviewed the June 2, 1999, MRI. Dr. Wiley made x-rays during the examination, which showed normal hips, normal sacroiliacs, no transitional vertebrae, lower lumbar tilt, minimal diminution in the height of L4-L5 interspace, no subluxations, mild lordotic curve, and no defects in the parsinterarticularis (R. 303).

Dr. Wiley's impression was for lumbar spine sprain and lumbar disc displacement with sciatica. He found Plaintiff was temporarily totally disabled and should continue physical therapy (R. 303).

On October 25, 1999, Plaintiff was diagnosed by Dr. Khan with low back pain, hypertension, and left back pain. Her blood pressure was 120/96. Dr. Khan's office notes reflected, in part, that he prescribed Darvocet and Skelaxin (R. 464).

In November, 1999, Plaintiff presented to Dr. Khan with complaints of feeling ill and nauseated. Plaintiff stated she had pain in her back that radiated down her legs, pressure in her lower back, and frequent indigestion. Plaintiff stated her chest hurt. Dr. Khan's office notes reflected, in part, that he diagnosed back pain, hypertension, tachycardia, and palpitations, recommended Plaintiff reduce her sodium and caffeine intake and reduce her weight, and prescribed Darvocet and Skelaxin (R. 463).

On December 30, 1999, Plaintiff presented to Dr. Khan with sharp pains in her chest. She stated she had experienced these pains for one month and they "seem[ed] to be getting worse."

9

Plaintiff stated her blood pressure went "up & down – big fluctuation." Plaintiff informed Dr. Khan she was nauseated and she experienced "some dyspnea." Plaintiff's blood pressure was 122/72 and her weight was 231 pounds. Plaintiff stated she needed help homemaking and preparing meals (R. 462). Dr. Khan's office notes read, in part, that he diagnosed Plaintiff with chest pain and dyspnea and instructed Plaintiff to lose weight and reduce her caffeine consumption (R. 461).

On January 21, 2000, Plaintiff was "asked to come in to" Dr. Khan's office "to complete disability forms." Her blood pressure was 140/82 and her weight was 233 pounds. Plaintiff stated she was able to bathe and dress herself. Plaintiff stated she could not drive. Plaintiff stated she "need[ed] help homemaking" and making meals (R. 456). Upon examination that date, Dr. Khan diagnosed chest pains and angina. He prescribed Cardura (R. 455).

On February 24, 2000, Dr. Wiley examined Plaintiff's back. He noted she was being treated by Dr. Quinlan for hypertension, but, otherwise, was in "good general health" (R. 284). Plaintiff denied use of alcohol but stated she smoked one-half package of cigarettes per day (R. 285). Her blood pressure was 138/108. She stood unassisted and had no gross scoliosis. She had an antalgic lean, but no hypolordosis or hyperlordosis. Plaintiff complained of tenderness at L5 and in the left sciatic notch area. Dr. Wiley observed no paraspinal muscle tenderness or spasm or sacroiliac joint tenderness. Plaintiff could not do a full squat. Plaintiff's maximum true lumbar flexion was 28 degrees; maximum true lumbar extension was four degrees; left lateral bending was twenty degrees; and right lateral bending was eight degrees. Plaintiff had no loss of motor strength, but there was diminished sensation at the L5-S1 dermatome on the left. Plaintiff's deep tendon reflexes were active and equal in the lower extremities. Her straight leg raising test was positive on the left at 45 degrees while sitting. It was negative on the right (R. 287).

The x-rays made by Dr. Wiley on that date showed normal hips, normal sacroiliacs, no transitional vertebrae, sciatic scoliosis present throughout the lumbar spine, normal lordotic curve with diminution in the height of L4-L5, and intact parsinterarticularis (R. 287).

Dr. Wiley's impression was for lumbar spine sprain and lumbar disc displacement with radiculopathy. His recommendation was that Plaintiff remain on temporary total disability; be referred to the pain clinic; have a repeat MRI of the lumbar spine; have her care transferred to a primary care physician; and should be considered for surgery if "increas[ed] pathology on the MRI" is displayed (R. 288).

On February 29, 2000, Robert E. Quinlan, D.O., corresponded with Dr. Khan relative to the results of Plaintiff's "thirty day event monitor." He opined there were "multiple transmissions and varying symptoms, but none of them correlated with any arrhythmia." Dr. Quinlan prescribed Cardura for Plaintiff's hypertension. He recommended "[n]o further cardiac work-up" for Plaintiff (R. 281).

On April 4, 2000, Plaintiff presented to Dr. Khan with complaints of her leg and foot staying cold. She stated she was "having problems but she [would] not state because she ha[d] no insurance." Plaintiff's blood pressure was 140/92. Her weight was 223 pounds (R. 452). Dr. Khan's office notes read, in part, that Plaintiff had decreased range of motion and low back and left leg pain, and he prescribed a Medrol Dosepak (R. 453).

On April 10, 2000, a MRI was made of Plaintiff's lumbar spine, which showed "localized herniation of disc at L4-5" that may have been "chronic and [was] minimal, showing no evidence of central stenosis or neural impingement of the lateral recesses or foramina." The remainder of the MRI was normal (R. 343).

11

On August 7, 2000, Dr. Khan diagnosed Plaintiff with hypertension and prescribed Cardura (R. 451).

On August 11, 2000, C. F. Shaw, D.C., completed an Independent Medical Examination of Plaintiff (R. 312-22). He diagnosed Plaintiff with lumbosacral sprain/strain and lumbar disc displacement without myelopathy (R. 320). Dr. Shaw opined Plaintiff's diagnosis was related "to work causes but require[d] apportionment and is complicated by obesity, no modified work availability and lack of confidence in her rehabilitation coordinator." Dr. Shaw found Plaintiff had reached her maximum degree of medical improvement and could return to work on a light to sedentary basis (R. 321).

On August 29, 2000, Stephen I. Lester, M.D., completed an Independent Medical Report of Plaintiff (R. 521). The x-ray he made of Plaintiff's lumbar spine that day revealed scoliosis convex to the right with spurring at L4-5. There was no significant disc space narrowing or other abnormalities noted. Dr. Lester reviewed the records of Dr. D'Amato and Dr. Jones (R. 522). He diagnosed "lumbosacral spine." He opined Plaintiff had reached maximum degree of medical improvement and could return to "modified work" (R. 523). Dr. Lester found Plaintiff was not temporarily totally disabled (R. 524).

On September 6, 2000, Plaintiff underwent a Motor Nerve Study, Sensory Nerve Study, and an EMG Study, which were conducted by Shiv Navada, M.D. All studies were normal and did not support L3-S1 radiculopathy on the left side (R. 344-45).

On October 24, 2000, Plaintiff presented with complaints of stress "because her kids were taken into States [sic] custody." Plaintiff informed Dr. Khan she was not sleeping and was "very upset." Plaintiff asserted she was not suicidal or homicidal (R. 450). Dr. Khan's office notes read,

12

in part, that he diagnosed Plaintiff with hypertension, back pain and leg pain, insomnia, and stress and prescribed Valium (R. 449).

On November 6, 2000, Dr. Khan diagnosed Plaintiff with hypertension and anxiety and prescribed Valium (R. 448).

On December 7, 2000, Plaintiff presented to Dr. Khan with complaints of pain in the middle of her chest radiating into her left clavicle, headache, not sleeping, stress, and no energy. Her blood pressure was 130/90. She was taking Cardura and Ventolin (R. 445).

On December 11, 2000, Plaintiff was diagnosed with chest pain, bradycardia, tachycardia syndrome, strep, neck pain, and fatigue. Dr. Khan noted Plaintiff was a smoker (R. 446).

On January 12, 2001, an Intake Summary was completed on Plaintiff at the Appalachian Community Health Center by Lora L. Elmore, B.S., Admissions Crisis Staff. Her provisional diagnostic impression was for major depressive disorder recurrent moderate and alcohol abuse (Axis I) and GAF 65 (Axis V). Ms. Elmore opined the services Plaintiff needed were substance abuse evaluation, functional assessment, and crisis service information (R. 370).

On February 1, 2001, a Substance Abuse Assessment was completed on Plaintiff by the Appalachian Community Health Center by Susan Mullens, a licensed psychologist. Plaintiff was referred for the assessment by the West Virginia Department of Health and Human Resources due to her children having been placed into State's custody due to behavioral problems. It was noted Plaintiff lived with her husband and twelve-year old daughter, who had been returned to the home after being in State placement; her fifteen-year old son was residing at the West Virginia Children's Home (R. 365, 368). Plaintiff stated she drank "a few beers or mixed drinks a few times per year" (R. 365). Plaintiff reported she did not smoke marijuana and had used Demerol, Percocet, and

13

Percodan for back pain. Plaintiff stated she medicated her high blood pressure with Cardura and her asthma with Ventolin nebulizer (R. 366).

Plaintiff stated her relationship with the father of her children was abusive to the degree that she sustained injuries from physical attacks which required hospitalization on "multiple occasions." Plaintiff stated "her drinking was to help her cope with the abuse," that she "received services from Women's Aid in Crisis" in the past, and she continued "to see a therapist there very [sic] two weeks in order to address the issues related to past abuse" (R. 366).

Plaintiff was diagnosed with alcohol dependence in sustained partial remission (Axis I); hypertension, asthma, back problems by self report (Axis III); and GAF 85 (Axis V) (R. 366).

On February 23, 2001, Plaintiff presented to Dr. Khan with bronchitis, sinusitis and ankle edema, for which he prescribed Keflex (R. 440).

On February 24, 2001, Arturo Sabio, M.D., completed a consultative examination of Plaintiff for the West Virginia Disability Determination Service. Her chief complaints were for hypertension, chest pain, shortness of breath, and low back pain (R. 371). Plaintiff stated she experienced shortness of breath, which limited her to walking one block. Plaintiff's straight leg raising test was sixty degrees bilaterally. Her hip flexion was restricted to eighty degrees bilaterally due to pain. Plaintiff could not walk on her heels or heel-to-toe walk in tandem. Plaintiff could walk on her toes. Plaintiff could not stand on her left leg and she could not squat due to pain. She walked with an antalgic gait. She was stable at station. Plaintiff did not lurch, there was no muscle weakness or atrophy, her deep tendon reflexes were normal, and there was no evidence of neuropathy (R. 377). After examining Plaintiff, Dr. Sabio diagnosed hypertensive cardiovascular disease; angina; bronchial asthma, by history; degenerative disc disease; chronic back pain; and acute rhinitis (R. 376).

14

On March 7, 2001, a state agency physician, Fulvio R. Franyutti, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry ten pounds, frequently lift and/or carry ten pounds, stand and/or walk at least two hours in an eight-hour workday, sit for a total of about six hours in an eight-hour work day, and push and/or pull unlimited (R. 380). Dr. Franyutti found Plaintiff could never climb ladders, ropes or scaffolds, but could occasionally climb ramps and stairs. Dr. Franyutti found Plaintiff was occasionally limited in her ability to balance, stoop, and kneel, but that she could never crouch or crawl (R. 381). Dr. Franyutti found Plaintiff had no manipulative, visual, or communicative limitations (R. 382-83). He found Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, poor ventilation, and hazards. Dr. Franyutti found Plaintiff's exposure to wetness, humidity, noise, and vibrations were unlimited. He found Plaintiff should avoid all exposure to heights (R. 383). Dr. Franyutti reduced Plaintiff's RFC to sedentary (R. 384).

On March 9, 2001, Plaintiff presented to the Emergency Department of Davis Memorial Hospital with complaints of chest pain. Plaintiff stated she smoked more than one package of cigarettes per day. Her electrocardiogram showed normal sinus rhythm (R. 263). Her white count was elevated. Plaintiff was admitted to rule out myocardial infarction (R. 264).

Plaintiff was admitted to Davis Memorial Hospital on March 9, 2001, her electrocardiogram was unremarkable. A SPECT scan showed "evidence of anterior wall myocardial ischemia." Her chest x-ray showed no evidence of cardiopulmonary disease. Plaintiff was discharged with the diagnosis of chest pain with positive stress test, possibly angina, and mild chronic obstructive pulmonary disease from cigarette abuse. She was prescribed Metoprolol and Cardura. Plaintiff was

released on March 13, 2001 (R. 388).

On March 13, 2001, Plaintiff underwent a "left heart catheterization, left ventricular function study and coronary angiography" at Monongalia General Hospital. The result was for normal wall motion in all left ventricular wall segments and normal systolic function (R. 433, 434, 721). Plaintiff's ejection fraction was "55-60%." "No mitral regurgitation with normal sinus beats" was noted (R. 433). The impression was for false positive nuclear study (R. 434). Robert J. Beto, II, M.D., noted Plaintiff's coronary arteries were normal he urged Plaintiff to cease smoking (R. 432).

On March 21, 2001, Plaintiff presented to a physician with complaints of chest pain. He instructed Plaintiff to stop smoking and ordered a CT scan of her chest. He prescribed Vioxx (R. 436).

On April 5, 2001, a CT scan was made of Plaintiff's chest. It showed no focal abnormality "to explain chest pain" and "[p]osterior pleural thickening and dependent atelectasis" (R. 437).

On April 19, 2001, Dr. Khan's office notes read, in part, that he diagnosed Plaintiff with asthmatic bronchitis and referred her to a pulmonologist (R. 436).

On May 9, 2001, Plaintiff underwent a consultative examination by Harakh Dedhia, M.D., a pulmonologist in the WVU Department of Medicine, due to the April 5, 2001, CT scan that showed "some pleural thickening" (R. 722). Dr. Dedhia's examination of Plaintiff found her blood pressure was 122/90; her weight was 222.6 pounds; no heart gallop, murmur, or rub and regular rate and rhythm; and her chest was clear to auscultation bilaterally. Dr. Dedhia found Plaintiff's chest x-ray was "essentially normal" and the CT scan showed "no parenchymal disease and normal mediastinum," but "posterior pleural thickening." He opined Plaintiff's chest pain was "not cardiac or pulmonary in origin, probably musculoskeleton (?fibromyalgia). The patient also has a history

16

of asthma and continues to smoke. The patient also has pets at home. The asthma seems to be fairly controlled." Dr. Dedhia advised Plaintiff to stop smoking and "addressed the issue of having pets at home that might have been exacerbating her obstructive airway disease symptoms." He recommended Plaintiff undergo a complete set of pulmonary function tests and return in two or three months for reevaluation (R. 723).

On August 29, 2001, L. Dale Simmons, M.D., reviewed the March 7, 2001 Physical Residual Functional Capacity Assessment of Plaintiff by Dr. Franyutti and affirmed same (R. 510).

On August 30, 2001, a state agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. The state agency physician found Plaintiff could occasionally lift and/or carry ten pounds, frequently lift and/or carry ten pounds, stand and or walk for a total of at least two hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday, and push and/or pull unlimited (R. 503). The state agency physician found Plaintiff could occasionally climb ramps and stairs, balance, stoop, and kneel, but never climb ladders, ropes, scaffolds, crouch, or crawl (R. 504). Plaintiff was found to have no manipulative, visual, or communicative limitations (R. 505-06). The state agency physician found Plaintiff should avoid concentrated exposure to extreme cold and heat and to fumes, odors, dusts, gases, and poor ventilation. Plaintiff should avoid even moderate exposure to vibration and should avoid all exposure to hazards. The state agency physician found Plaintiff was unlimited in her exposure to wetness, humidity, and noise (R. 506). The state agency physician reduced Plaintiff's RFC to sedentary (R. 507).

On October 11, 2001, Plaintiff presented to the Emergency Department of Davis Memorial Hospital with an injury to her left wrist (R. 511). A x-ray showed no bony destruction or fracture or dislocation (R. 514). Plaintiff was provided a splint and Motrin. She was released (R. 515).

17

On June 24 and 25, 2002, Rosetta Underwood, Ed.D., Licensed Psychologist, and Wilda Posey, Supervised Psychologist, completed a Psychological Evaluation of Plaintiff at the request of Plaintiff's lawyer, Monti VanNostrand, to "assist with his [sic] Social Security disability claim (R. 546, 556). Plaintiff stated she was applying for Social Security Disability because she was "always in pain with [her] back." She stated she had injured her back at work when she "shoveled three truckloads of mulch." Plaintiff stated she had injured her neck, back and shoulder in a motor vehicle accident in 2000. Plaintiff stated she had developed a bulging disc at L4 in 1996 when she tried to lift a patient at work. Plaintiff stated her doctor would not release her to work (R. 546). Plaintiff listed her conditions as degenerative disc disease, asthma, pleurisy, and post traumatic stress disorder from domestic violence related to her children's father (R. 547). Dr. Underwood and Ms. Posey reviewed Plaintiff's medical records (R. 547-49). Plaintiff reported she was taking Wellbutrin twice daily and no other medications. Plaintiff reported she experienced nightmares on a nightly basis and sleeping for one to two hours before waking from pain and/or nightmares (R. 549).

Plaintiff reported her past substance abuse included consuming one and one-half gallons of whisky on her own or with friends on a daily basis. She last drank in 1993. Plaintiff reported abusing prescription drugs and smoking marijuana from 1988 through 1993. Additionally, Plaintiff "tried coke one time" in either 1989 or 1991. Plaintiff reported she currently smoked one-third package of cigarettes per day and drank two to three cups of coffee per day (R. 549).

Plaintiff reported she was receiving counseling at Elkins Family Counseling Center once weekly. Plaintiff stated she received counseling through Appalachian Community Health between 1988 and 1993. Plaintiff stated her daughter was in State custody and she had had "problems with her son in the past." Plaintiff stated her children's father had physically abused her. She had

18

"suffered a broken nose, a laceration of the eye, a fractured jaw, chipped shoulder blade, broken ribs, and had all of her teeth knocked out." Plaintiff reported she was "extremely fearful of" him (R.550).

Plaintiff reported her activities of daily living were as follows: rose at 6:00 a.m., did some dishes, did a "little bit of cooking," and took care of her personal hygiene. Plaintiff stated her bedtime varied, she ate once per day, had no energy, had loss of pleasure, attended counseling once per week, attended parenting classes once per week, visited her daughter once or twice per week, and visited her doctor once per month or as needed. Plaintiff stated she enjoyed gardening, planting flowers, and quilting and that her husband helped her with these activities. Plaintiff stated her husband and son did the major lifting, sweeping, carrying, and laundry (R. 551).

Upon examination, Plaintiff was cooperative and polite. Her eye contact was good. She was alert, attentive, and adequately oriented to time, place, person, and circumstance. Plaintiff reported her mood as "[n]ot real happy." The evaluators listed Plaintiff's observed mood as "depressed with a somewhat flattened affect." It was noted Plaintiff did "not exhibit any humor and did not make any spontaneous conversation." Plaintiff's immediate memory was normal; thought processes were normal; reality contact was normal; and pace and persistence were normal. Plaintiff denied hallucinations, delusions, illusions, suicidal ideations, homicidal ideations, or paranoia. Plaintiff's "conversation was dominated by her pain and medical problems" (R. 552).

Plaintiff scored the following on WAIS III: Verbal IQ was 94 (average range of intellectual functioning); Performance IQ of 78 (borderline range of intellectual functioning); and Full Scale IQ of 87 (low average range of intellectual functioning). Plaintiff's ability to understand and comprehend was average and her concentration was excellent. Plaintiff scored the following on the WRAT-III: reading was post high school; spelling was seventh grade; arithmetic was sixth grade (R.

553). Plaintiff scored a 36, which showed severe depression, on the Beck Depression Inventory, a self-report instrument (R. 554). Ms. Posey and Dr. Underwood diagnosed Plaintiff as follows: Axis I – pain disorder associated with both psychological factors and a general medical condition, alcohol dependence in full remission, posttraumatic stress disorder by history; Axis II – no diagnosis; Axis III – history of back injury and pain associated with her back, neck, and shoulder; Axis IV – occupation and economic problems; and Axis V – Current GAF of 58 (R. 554-55).

Ms. Posey and Dr. Underwood found Plaintiff functioned intellectually at the low average range; her judgment was normal; and her concentration was excellent. They found Plaintiff met the criteria for Posttraumatic Stress Disorder due to her indicating her mood was poor, she lost sleep due to nightmares and pain, and she dreamed of her children's father hurting and trying to kill her. They recommended Plaintiff consult with a psychiatrist for PTSD, seek treatment for pain at a pain clinic, and continue with counseling (R. 555).

On July 18, 2002, Dr. Underwood completed a Psychiatric Review Technique of Plaintiff. She found Plaintiff had anxiety related disorders (R. 557). Dr. Underwood opined Plaintiff had "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week." Dr. Underwood noted post traumatic stress disorder was the "pertinent symptom[], sign[], and laboratory finding[] that substantiate[d] the presence of [the] impairment" (R. 562). Dr. Underwood found Plaintiff was moderately limited in her activities of daily living, mildly limited in her ability to maintain social functioning, and was not limited in her ability to maintain concentration, persistence, or pace (R. 567).

Also on July 18, 2002, Ms. Posey and Dr. Underwood completed a Mental Residual

Functional Capacity Assessment of Work-Related Abilities of Plaintiff. They found Plaintiff had no limitations in her abilities to understand and remember short, simple instructions; carry out short, simple instructions; or exercise judgment or make simple work-related decisions. Ms. Posey and Dr. Underwood opined Plaintiff was slightly limited in her ability to understand, remember, and carry out detailed instructions (R. 571). They found Plaintiff had a slight limitation in her abilities to sustain attention and concentration for extended periods; no limitation in maintaining regular attendance and punctuality; and moderate limitation in her ability to complete a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks. Ms. Posey and Dr. Underwood found Plaintiff had no limitation in her ability to interact appropriately with the public and a slight limitation in her abilities to respond appropriately to direction and criticism from supervisors and work in coordination with others without being unduly distracted by them (R. 572). Ms. Posey and Dr. Underwood found Plaintiff had no limitation in her abilities to maintain acceptable grooming and hygiene and to maintain acceptable standards of courtesy and behavior. They found Plaintiff had slight limitations in her abilities to work in coordination with others without unduly distracting them; relating predictably in social situations in the workplace without exhibiting behavioral extremes; demonstrating reliability; and ask simple questions or request assistance from coworkers or supervisors. They opined Plaintiff was moderately limited in her ability to respond to changes in the work setting or work process and slightly limited in her ability to be aware of normal hazards and take appropriate precautions (R. 573). Ms. Posey and Dr. Underwood found Plaintiff had no limitations in her ability to carry out an ordinary work routine without special supervision or to travel independently in unfamiliar places. They found Plaintiff had a slight limitation in her ability to set

21

realistic goals and make plans independently of others. Ms. Posey and Dr. Underwood found Plaintiff was moderately limited in her ability to tolerate ordinary work stress (R. 574). They opined Plaintiff's impairments and limitations existed since September, 1999 (R. 575).

On July 18, 2002, Dilip Chandran, M.D., of Elkins Family Counseling Center, completed a Pharmacological Management report of Plaintiff. He noted Plaintiff complained of "worsening concentration/depression/anxiety/PTSD" symptoms. He noted her mood was dysthymic and anxious and her affect was frustrated. He prescribed Wellbutrin and Valium (R. 664).

On August 16, 2002, Dr. Jones, Plaintiff's chiropractor, completed a Residual Functional Capacity Assessment. He diagnosed her with lumbo-sacral dysfunction, thoracic plexus disorder, and cervic-cranial syndrome. He listed the following clinical findings in support of those diagnoses: decreased range of motion "in each area with evoked pain, straight leg raises bilaterally. Weak right grip strength . . ." (R. 576). He noted that many of his "observations [were] as reported by the patient" (R. 577). Dr. Jones opined Plaintiff was capable of sedentary work (R. 578).

On August 30, 2002, Dr. Chandran completed a Mental Residual Functional Capacity Assessment of Work-Related Abilities of Plaintiff. He found Plaintiff was slightly limited in following abilities: understand and remember short, simple instructions; carry out short, simple instructions; maintain acceptable standards of grooming and hygiene; maintain acceptable standards of courtesy and behavior; ask simple questions or request assistance from coworkers or supervisors; and be aware of normal hazards and take appropriate precautions. He found Plaintiff was moderately limited in the following abilities: understand and remember detailed instructions; exercise judgment or make simple work-related decisions; maintain regular attendance and punctuality; relate predictably in social situations in the workplace without exhibiting behavioral extremes; demonstrate

22

reliability; respond to changes in the work setting or work processes; and set realistic goals and make plans independently of others. Dr. Chandran found Plaintiff had marked limitations in her abilities to: carry out detailed instructions; sustain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks; interact appropriately; respond appropriately to direction and criticism from supervisors; work in coordination with others without being unduly distracted by them; carry out an ordinary work routine without special supervision; tolerate ordinary stress; and work in coordination with others without unduly distracting them. Dr. Chandran found Plaintiff was extremely limited in her ability to travel independently in unfamiliar places (R. 586-90).

Dr. Chandran also completed a Psychiatric Review Technique of Plaintiff on August 30, 2002. He opined Plaintiff met Listing "12.04 . . . 12.06" and she equaled Listing "12.04 . . . 12.06" (R. 591). Dr. Chandran found Plaintiff's affective disorder was a depressive syndrome characterized by "anhedonia or pervasive loss of interest in almost all activities, or appetite disturbance with change in weight, or sleep disturbance, or psychomotor agitation or retardation, or decreased energy, or feelings of guilty or worthlessness, or difficulty concentrating or thinking, or thoughts of suicide" (R. 594). Dr. Chandran found Plaintiff's anxiety related disorders were evidenced by "generalized persistent anxiety accompanied by . . . motor tension, or autonomic hyperactivity, or apprehensive expectation, or vigilance and scanning" and "recurrent and intrusive recollection of a traumatic experience, which [was] a source of marked distress" (R. 596).

Dr. Chandran found Plaintiff was markedly limited in her activities of daily living; in her ability to maintain concentration, persistence, or pace; and in her ability to maintain social

functioning. He found Plaintiff had experienced three repeated episodes of decompensation, each of extended duration (R. 601).

Also on August 30, 2002, Dr. Chandran completed a Pharmacological Management report of Plaintiff. He listed Plaintiff's subjective complaints as ongoing depression, PTSD symptoms, anxiety and feeling overwhelmed. Plaintiff reported family counseling had "been stressful." She reported her sleep as "initial/middle insomnia." Dr. Chandran listed his objective findings as Plaintiff was alert, was oriented, had spontaneous speech, had dysthymic/anxious mood, had appropriate affect, and had no other thought symptoms. Dr. Chandran listed Plaintiff's diagnoses as recurrent major depressive disorder, severe without psychotic features; posttraumatic stress disorder; alcohol abuse in sustained remission; nicotine dependence; back and shoulder injuries; hypertension; and asthma. Dr. Chandran listed Plaintiff's medications as Wellbutrin and Valium (R. 663).

From September 10, 2002, through January 3, 2003, Plaintiff received chiropractic treatments from Dr. Jones (R. 699-700).

On October 17, 2002, Dr. Chandran completed a Pharmacological Management report of Plaintiff. He listed Plaintiff's subjective complaints as ongoing depression, PTSD symptoms, anxiety and feeling overwhelmed. Plaintiff reported family counseling had "been helpful." She reported her sleep as "initial/middle insomnia." Dr. Chandran listed his objective findings as Plaintiff was alert, was oriented, had spontaneous speech, had dysthymic/anxious mood, had appropriate affect, and had no other thought symptoms. Dr. Chandran listed Plaintiff's diagnoses as recurrent major depressive disorder, severe without psychotic features; posttraumatic stress disorder; alcohol abuse in sustained remission; nicotine dependence; back and shoulder injuries;

24

hypertension; and asthma. Dr. Chandran listed Plaintiff's medications as Wellbutrin and Valium (R. 662).

On October 31, 2002, Plaintiff presented to Dr. Khan with complaints of dizziness, headaches, and passing out. She reported she had "been out of" her hypertension medication for six months. Dr. Khan prescribed Cardura, Valium, Wellbutrin, and Ventolin (R. 733-34).

On November 13, 2002, a Clinical Update was taken of Plaintiff at the Family Counseling Center. The interviewer was Amy Jones, M.A., a supervised psychologist (R. 660). It was recommended that Plaintiff "continue receiving pharmacological management monthly to monitor the effectiveness of her psychotropic medications" and "should continue individual therapy and family therapy on a weekly basis" (R. 661).

On November 14, 2002, Dr. Chandran completed a Pharmacological Management report on Plaintiff. He listed Plaintiff's subjective complaints as ongoing depression, PTSD symptoms, anxiety, fatigue, and feeling overwhelmed. Plaintiff informed Dr. Chandran that "family counseling [had] been helpful." She described her sleep at "initial/middle insomnia." Plaintiff reported her daughter was at the "WC Children's Home" and that the "family stressors with daughter have been persistent." Dr. Chandran's objective findings were that Plaintiff was alert, was oriented, had alert speech, had dysthymic/anxious mood, had frustrated affect, and had no other thought symptoms. Dr. Chandran noted Plaintiff's medication included Wellbutrin, Valium, Ventolin nebulizer, and Cardura. He diagnosed Plaintiff with recurrent major depressive disorder, severe without psychotic features; PTSD; alcohol abuse in sustained remission; nicotine dependence; back and shoulder injuries; hypertension; and asthma (R. 659).

On December 6, 2002, Dr. Jones corresponded with attorney Michael Benninger relative to

Plaintiff's motor vehicle accident (R. 696). Dr. Jones listed Plaintiff's diagnoses as chronic lumbar and cervical dysfunction exacerbated by post traumatic soft tissue injury with associated mild to moderate limitations in activities of daily living (R. 697). He wrote that Plaintiff had reached maximum medical improvement but remained in mild to moderate levels of pain (R. 698).

On December 27, 2002, Dr. Chandran listed Plaintiff's subjective symptoms as ongoing depression, posttraumatic stress disorder symptoms, anxiety, fatigue, feeling overwhelmed, and initial/middle insomnia. Plaintiff reported her sleep had improved to four to five hours per night. Plaintiff stated her daughter had been doing well at the "Children's Home and [was] presently home for . . . the holidays." Dr. Chandran listed Plaintiff's objective symptoms as her being alert and oriented; her speech was more spontaneous; her mood was dysthymic/anxious; her affect was frustrated; and she had no other thought symptoms. His diagnosis was for recurrent major depressive disorder, severe without psychotic features; alcohol abuse in sustained remission; nicotine dependence; back and shoulder injuries; hypertension; and asthma. Dr. Chandran listed Plaintiff's medications as Wellbutrin, Valium, Trazodone, Ventolin nebulizer, and Cardura (R. 658).

On February 6, 2003, a Pharmacological Management report was completed by Dr. Chandran. He listed Plaintiff's diagnoses as recurrent major depressive disorder, severe without psychotic features; alcohol abuse in sustained remission; nicotine dependence; back and shoulder injuries; hypertension; and asthma. He listed Plaintiff's medications as Wellbutrin, Valium, Trazodone, Ventolin nebulizer, and Cardura. He listed Plaintiff's subjective complaints as ongoing depression, posttraumatic stress disorder symptoms, anxiety, fatigue, and feelings of being overwhelmed. Plaintiff reported her sleep had improved to four and one-half to five hours per night. She smoked five cigarettes per day. Plaintiff reported her daughter had been arrested for shoplifting

26

while on a pass from the Children's Home, but Plaintiff had begun to feel more positive about her daughter's behavior. Dr. Chandran's objective findings were Plaintiff was alert, oriented, had spontaneous speech, had slightly dysthymic mood, was calmer, was less frustrated affect, and had no other thought symptoms (R. 657).

On February 10, 2003, Plaintiff presented to Dr. Khan with complaints of chest and substernal pain (R. 735).

On February 12, 2003, Plaintiff's upper GI was "essentially unremarkable" (R. 704).

Plaintiff's chest x-ray, taken on February 12, 2003, was "negative" (R. 705).

On February 20, 2003, Plaintiff underwent a Clinical Evaluation by Karen Flynn, M.S., a supervised psychologist at the Elkins Family Counseling Center, in an effort to secure Medicaid benefits (R. 653). Plaintiff recounted physical abuse by her former husband. Plaintiff stated that she drank heavily and used drugs during her first marriage, but had not since 1994. Plaintiff informed Ms. Flynn her daughter was in State custody and her son lived at home with her. Ms. Flynn administered the Kaufman Brief Intelligence Test, which revealed Plaintiff functioned in the average range of intelligence (R. 654). Plaintiff scored the following on the WRAT-3: reading was 87; spelling was 70; and arithmetic was 81. Ms. Flynn noted these scores "were well below her predicted ability." Plaintiff's Bender figures were within normal limits. The results of Plaintiff's MPPI-2 profile indicated that Plaintiff was "severely depressed and expressed a great deal of her emotional discomfort through somatic symptoms and complaints" (R. 655). Ms. Flynn's diagnostic impressions were as follows: Axis I – major depressive disorder, recurrent, severe, without psychotic features (primary); pain disorder associated with both psychological factors and general medical condition, chronic posttraumatic stress disorder, nicotine dependence, alcohol abuse in sustained full

27

remission, parent-child relational problem, bereavement, (secondary); Axis II – deferred; Axis III – asthma, degenerative disc disease (by history), neck and shoulder pain, heart catheterization in 2000 and 2001, hypertension, head injury; Axis IV – problems with primary support group, infrequent contact with truck driver husband, conflicted relationship with daughter; Axis V – GAF 45 (R. 655-56). Ms. Flynn recommended Plaintiff be provided a Medicaid card and continue to receive individual therapy (R. 656).

On March 20, 2003, Dr. Chandran completed a Psychiatric Evaluation of Plaintiff. Her chief complaint was she had "been having more nightmares and feeling depressed, on edge, mad and aggravated!" Dr. Chandran noted Plaintiff had had "ongoing depressive symptoms, sad moods, anhedonia, irritability, frustration, anger feelings, 'feeling on edge', [sic] nightmares of past abuse, mild mood swings, crying spells, racing thoughts, poor concentration/memory, fatigue, lack of a sexual drive and poor appetite/sleep." He found Plaintiff had no hallucination, delusions, specific paranoias, hypomanic moods, manic moods, obsessive thoughts, panic attacks, or other psychiatric symptoms (R. 650). Dr. Chandran noted Plaintiff had "experience[d] an abusive relationship from 1982 through 1991 [wherein] [s]he had sustained multiple injuries as this man (the father of her son/daughter) had broken her nose/jaw, chipped her shoulder blade, broke [sic] her ribs, lacerated her eye and knocked out all of her teeth." Dr. Chandran noted Plaintiff had not received any previous inpatient hospitalization or outpatient psychiatric treatment (R. 651).

Dr. Chandran's mental examination of Plaintiff revealed she demonstrated mild distractibility; she was alert and oriented in all spheres; her mood was dysthymic and anxious; her affect was frustrated; her immediate, recent, and remote memories were intact; her thought form was clear and coherent; her thought content was consistent with vegetative symptoms of depression,

anxiety, and post-traumatic symptoms; she had no hallucinations, delusions, or paranoia; her judgment was in intact; and her insight was fair (R. 652).

Dr. Chandran diagnosed the following: Axis I – recurrent major depression, severe without psychotic features; PTSD; pain disorder associated with both psychological factors and chronic general medical condition; nicotine dependence; alcohol abuse in sustained remission; and parent-child relationship problem; Axis II – none; Axis III – multiple medical problems; Axis IV – multiple medical problems, problems in the social environment, victim of physical abuse, daughter's placement, and poor primary supports; and Axis V – GAF 52 (652).

From April 24, 2003, through June 10, 2004, Plaintiff received chiropractic care from Dr. Jones (R. 690-95).

On May 9, 2003, Dr. Chandran listed Plaintiff's subjective symptoms as "ongoing depression, PTSD symptoms, anxiety and fatigue." Plaintiff stated she felt "overwhelmed regarding financial stressors" and "issues with her daughter . . . ." Plaintiff stated she slept four and one-half to five hours per night, smoked three to six cigarettes per day, and drank one to two cups of coffee daily. Plaintiff stated she had pain in her legs, back and shoulders. Dr. Chandran listed Plaintiff's objective symptoms as slightly dysthymic mood and mildly restricted affect. Dr. Chandran's diagnoses were recurrent major depressive disorder, severe without psychotic features; post-traumatic stress disorder; alcohol abuse, in sustained remission; nicotine dependence; back and shoulder injuries; hypertension; and asthma. He continued Plaintiff's prescriptions for Wellbutrin, Valium, Trazodone, Ventolin, and Cardura (R. 649).

On June 24, 2003, Dr. Khan diagnosed Plaintiff with dyspnea, asthma, GERD, and varicose veins. He prescribed a Z-Pak and Zantac (R. 739).

29

On June 26, 2003, Dr. Chandran listed Plaintiff's subjective symptoms as "ongoing depression, PTSD symptoms, anxiety and fatigue." Plaintiff stated she felt "overwhelmed regarding financial stressors, as well as issues with her daughter . . . who remain[ed] at the" State's children's home. Plaintiff stated she slept three to four hours nightly, smoked three to six cigarettes per day, and drank one to two cups of coffee per day. Plaintiff stated she continued to experience pain in her legs, back and shoulders. Plaintiff stated that "sometimes I just feel like I want to give up and let them do what they want to do" (R. 648).

Dr. Chandran listed Plaintiff's objective symptoms as slightly dysthymic mood and frustrated affect. Dr. Chandran's diagnoses were recurrent major depressive disorder, severe without psychotic features; post-traumatic stress disorder; alcohol abuse, in sustained remission; nicotine dependence; back and shoulder injuries; hypertension; and asthma. He noted Plaintiff's medications were Wellbutrin, Valium, Trazodone, Ventolin, and Cardura, and he continued her prescriptions (R. 648).

Dr. Khan's July 11, 2003, office notes read, in part, that Plaintiff presented with complaints of left chest pain, leg pain, anxiety, depression, bronchitis, low back pain, neck pain, fatigue, and malaise. He prescribed Darvocet (R. 740).

On July 27, 2003, a x-ray of Plaintiff's left ankle revealed tissue swelling, but no fracture (R. 666).

On September 9 and 29, 2003, Plaintiff's Inhalant Allergy Screens were negative (R. 742-43).

On September 29, 2003, Dr. Khan's office notes read, in part, that he diagnosed Plaintiff with headaches, hypertension, left side chest pain, and wheezing. He ordered a x-ray and a fasting lipid test (R. 745).

On October 28, 2003, Dr. Khan's office notes read, in part, that he diagnosed Plaintiff with

hypertension and headaches (R. 746).

On November 12, 2003, Dr. Khan's office notes read, in part, that he diagnosed Plaintiff with chest pain (R. 754).

On November 12, 2003, Plaintiff had a chest x-ray made because of her complaints of shortness of breath. The results were for "[c]lear lungs and normal sized heart" and "[n]o acute disease seen" (R. 711, 748, 749).

On November 14, 2003, Plaintiff underwent a pulmonary function test. It was noted thereon that "spirometry is normal" (R. 753).

On November 18, 2003, Plaintiff was diagnosed with dyspnea by Dr. Khan (R. 750).

On March 2, 2004, Plaintiff presented to the Emergency Department of Davis Memorial Hospital with complaints of chest pain and pressure and left arm pain (R. 712-13). Plaintiff's EKG and CBC were normal. Plaintiff was released to home (R. 715, 718).

On April 30, 2004, a Treatment Plan was completed of Plaintiff at Family Counseling Center. It was noted Plaintiff was "baffled at the litigation that [was] occurring between the attorneys" relative to her motor vehicle accident and she was "upset by her daughter's decision to quit school." Plaintiff's medications included Valium, Trazodone, Cardura, Ventolin, Lexapro. It was noted Plaintiff was "off the Wellbutrin due to financial reasons." Plaintiff's symptoms were listed as sadness, depressed mood, irritability, psychomotor retardation or agitation, and poor concentration (R. 673). Her diagnosis was as follows: Axis I – major depressive disorder, recurrent, severe without psychotic features; pain disorder associated with both psychological factors and a general medical condition, chronic; PTSD; alcohol abuse in full, sustained remission; and parent-child relational problem; Axis II – diagnosis deferred; Axis III – asthma, degenerative disc disease, neck and

shoulder pain, heart catheterization, hypertension, head injury; Axis IV – problems with primary support group, infrequent contact with truck driver husband, and conflicted relationship with daughter; Axis V – current GAF 67 (R. 673-74).

On May 6, 2004, Dr. Khan completed a West Virginia Department of Health and Human Resources General Physical (Adult) form of Plaintiff. He noted Plaintiff weighed 223 pounds and her blood pressure was 132/90. He found Plaintiff's had sustained a neck injury; she had hypertension and angina; she had edema in her ankles and legs; her neurological examination was normal; she had severe depression, posttraumatic stress disorder, and anxiety; and her orthopedic examination was normal (R. 701). Dr. Khan noted Plaintiff experienced pain in her left shoulder, neck, left low back, sciatica nerve and left leg, and headaches. He diagnosed Plaintiff with hypertension, hyperlipidemia, dyspnea, posttraumatic stress disorder, and depression. Dr. Khan noted Plaintiff had not worked since 1999. He opined Plaintiff should avoid "all" work situations for more than one year. Dr. Khan also opined Plaintiff should be referred for vocation rehabilitation (R. 702).

On May 10, 2004, Dr. Chandran completed a Psychiatrist's Summary of Plaintiff for the West Virginia Department of Health and Human Resources. His diagnosis of Plaintiff was for recurrent major depressive disorder, hypertension; and back and shoulder pain. His prognosis for Plaintiff was poor. He listed the following employment limitations for Plaintiff: no prolonged periods of sitting or standing, no heavy lifting, and inability to work around others or with supervisors (R. 678).

On May 13, 2004, Dr. Jones completed a Physician's Summary for the West Virginia Department of Health and Human Resources. He listed Plaintiff's diagnoses as cervicocranial

32

syndrome, thoracic plexis disorder, and lumbosacral sprain. His prognosis for Plaintiff was "poor due to chronicity & severity. The patient has probably fibromyalgia as well." He opined Plaintiff had an employment limitation, but did not specify (R. 677).

On May 17, 2004, Dr. Chandran completed a Pharmacological Management report of Plaintiff. He noted Plaintiff's subjective complaints were as follows: she continued having difficulties getting the motor vehicle accident settled; her daughter planned to quit school; she felt overwhelmed by financial and family stressors; and she smoked about one-half package of cigarettes per day. Plaintiff stated she had "more good days in the last week" than bad. Dr. Chandran's objective findings were that Plaintiff was alert and oriented, her speech was spontaneous, her mood was dysthymic, her affect was restricted, she was not tearful, and she had no other thought symptoms. He diagnosed Plaintiff with recurrent major depressive disorder, severe without psychotic features; PTSD; alcohol abuse in sustained remission; nicotine dependence; back and shoulder injuries; hypertension; and asthma. He listed her medications as Valium, Trazodone, Lexapro, Ventolin nebulizer, Nicoderm patch, and Cardura (R. 668).

On June 15, 2004, a Clinical Update was completed of Plaintiff at the Family Counseling Center by Allan L. LaVoie, Ph.D. Plaintiff reported her law suit involving her motor vehicle accident was nearing culmination, which had been "traumatic" for her (R. 669). Plaintiff informed Dr. LaVoie that her son had graduated from high school but that her daughter continued to threaten to quit school (R. 669-70). Dr. LaVoie noted the following as to Plaintiff's mental status: appearance was neat and clean; motor skills were normal; speech was normal; attitude was resigned; affect was depressed, anxious, frustrated; thought content and process were normal; perception and consciousness were normal; intellect was estimated to be average; insight and judgment were fair;

33

oriented times four; and significant history of domestic violence and loss (R. 670). Dr. LaVoie made the following diagnostic impression: Axis I – major depressive disorder, recurrent, severe without psychotic features (primary); alcohol abuse in sustained full remission by self report; PTSD; nicotine dependence; Axis II – none; Axis III – asthma, hypertension, congenital heart problems, various injuries that cause chronic pain, hysterectomy, degenerative disc disease; Axis IV – problems with primary support group, marginal relationship with husband, history of domestic violence, problems with social environment, limited social network, and occupational problem "disabled"; Axis V – current GAF 65. Dr. LaVoie recommended Plaintiff continue receiving therapy treatment (R. 671).

In a June 20, 2004, in a letter to attorney Christopher M. Wilson, Dr. Jones wrote Plaintiff was "unable to perform work duties due to pain, ROM losses, and motor and sensory deficits in both upper and lower extremities. She is unable to remain posturally static in any position for very long and has had repeated problems with her legs giving way and falling" (R. 689).

On June 21, 2004, Dr. Jones completed a Residual Functional Capacity Assessment of Plaintiff. He listed Plaintiff's diagnoses as lumbosacral dysfunction, thoracic plexis disorder, cervicocranial syndrome (R. 681). He listed 24 symptoms and impairments alleged by Plaintiff (R. 682). He found Plaintiff would be capable of sedentary work; however, later in the report, he opined Plaintiff was disabled from all full-time work activity in September 1999 and was so disabled through the date of the report (R. 683, 687).

On July 27, 2004, Dr. Khan completed a Residual Functional Capacity Assessment of Plaintiff (R. 726). Dr. Khan opined Plaintiff was able to perform sedentary level work activity for an eight-hour day. He found she could stand for thirty minutes at a time and walk for thirty minutes at a time. Dr. Khan found Plaintiff would be able to be on her feet for a total of two hours in an

34

eight hour work day if walking and standing were alternately combined. Dr. Khan found Plaintiff had to alternate positions frequently due to back pain, weakness in her legs, her legs "giving out on her," "aggravation from MVA on neck & shoulder," and pain and numbness in left hand (R. 728). Dr. Khan found Plaintiff could never crouch, crawl, or squat. He found Plaintiff could infrequently climb, balance, stoop, bend, stretch, or reach. Dr. Khan found Plaintiff could occasionally kneel. Dr. Khan found Plaintiff was restricted to working with jarring or vibrating machinery, excessive humidity, cold or hot temperatures, dust, fumes, or environmental hazards. He found Plaintiff was not restricted to work activities that included noise (R. 729).

Dr. Khan opined it would be advisable or necessary for Plaintiff to recline or lie down with her feet elevated and to have frequent rest periods that included sitting during the day (R. 729). Dr. Khan opined Plaintiff's chronic pain would be chronic moderate and chronic moderate to severe (R. 729-30). Dr. Khan found Plaintiff would require the use of a cane 25% of the day for stability in standing and walking and that Plaintiff's obesity contributed to this need. Dr. Khan noted Plaintiff had to alternate positions every 45 minutes to one hour because her "left leg [went] to sleep" (R. 730). Dr. Khan found Plaintiff had to elevate her feet due to edema. He found Plaintiff could not use her feet or legs for repetitive motions. Dr. Khan found Plaintiff could use her right hand for simple grasping, arm controls, and fine manipulation, but not her left hand (R. 731).

Dr. Khan opined Plaintiff was not capable of performing any full-time job for eight hours per day, five days per week, on a sustained basis (R. 731). Dr. Khan fond Plaintiff had depression and anxiety, which, in combination with her other impairments, resulted in a greater degree of disability. Dr. Khan found Plaintiff was disabled from all full-time work from September 1999 to present (R. 732).

35

<u>Administrative Hearing</u>

At the August 12, 2004, administrative hearing, Plaintiff testified there were "some days [she did not] want to get out of bed" and there were "times [she would] sleep through a whole day" due to depression and back pain (R. 822). Plaintiff stated her husband and daughter helped her with the laundry. She stated she left the house for doctors' appointments and to shop for groceries (R. 829). Plaintiff testified she did not drive alone (R. 830). Plaintiff stated she talked to her mother but did not have regular contact with anyone else (R. 831). Plaintiff testified she had to "sit down for a few minutes" after she washed "a couple of dishes" (R. 834).

The ALJ asked the following hypothetical question of the VE:

> I'll ask you to assume a hypothetical individual of the claimant's age, educational background, and work history, who would be able to perform a range of sedentary work. Should have a sit/stand option. Could perform postural movements occasionally, except could not climb ladders, ropes, or scaffolding. Should not be exposed to hazards or environmental pollutants or temperature extremes. Should work in a low-stress environment with no production line type pace, or independent decisionmaking [sic] responsibilities. Would be limited to unskilled work involving routine and repetitive instructions and tasks. And should have no more than occasional interaction with others. Would there be any work in the regional or national economy that such a person could perform? (R. 835).

The VE testified the following sedentary jobs existed: bench worker – 1,000 jobs regionally/103,000 jobs nationally; general office clerk – 2,900 jobs regionally/99,000 jobs nationally (R. 836).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ Alexander made the following findings:

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of the decision.

36

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's degenerative dis [sic] disease of the lumbosacral spine with a herniated nucleus pulposus at L4-L5, a history of chest pain of undetermined etiology, bilateral venous insufficiency of the lower extremities, chronic obstructive pulmonary disease, obesity, major depressive disorder, post traumatic stress disorder, and pain disorder are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: the claimant is able to perform a range of sedentary work with a sit/stand option; the claimant can perform postural movements occasionally with the exception that the claimant may not climb ladders, ropes, or scaffolds; the claimant should never be exposed to extremes of temperature; the claimant should never be exposed to dust, fumes, gases, or other pulmonary irritants; the claimant is limited to unskilled, low stress, routine and repetitive work with no production line pace or independent decision making; the claimant should have no more than occasional interaction with supervisors, coworkers, or members of the general public.

7. The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is a "younger individual" (20 CFR §§ 404.1564 and 416.964).

9. The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR §§ 404.1567 and 416.967).

12. Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.27 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as bench worker,

1,000/103,000; general office clerk, 2,900/299,000.

13.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)) (R. 29-30).

## IV.  Discussion

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B.  Contentions of the Parties

The Plaintiff contends:

1.  The ALJ provided insufficient and incorrect reasons for rejecting the opinions of the treating psychiatrist, Dr. Chandran.

2.     The ALJ mischaracterized the medical records of Dr. Khan, failed to uphold his medical opinions, and failed without adequate explanation to include his limitations in the RFC.

The Commissioner contends:

1.     Substantial evidence supports the Commissioner's decision that Plaintiff retained the RFC to perform sedentary work.

## C. Treating Psychologist

Plaintiff contends the ALJ provided insufficient and incorrect reasons for rejecting the opinions of the treating psychiatrist, Dr. Chandran. Defendant contends substantial evidence supports the Commissioner's decision that Plaintiff retained the RFC to perform sedentary work.

Plaintiff argues, in part, that the ALJ rejected Dr. Chandran's opinion that Plaintiff was incapacitated and/or disabled indefinitely due to major depression, PTSD, and back and shoulder pain. (Plaintiff's brief at 10.) The undersigned finds these opinions concern issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability. A statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine that the claimant is disabled. 20 C.F.R. 404.1527(e)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." These opinions, therefore, cannot be accorded controlling weight or even any special significance.

In *Craig v. Chater*, 76 F.3d 585, 590(1996), the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony 'be given controlling weight.' *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. § 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

39

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

(Emphasis added).

There is no dispute Dr. Chandran was Plaintiff's treating psychiatrist. He was employed at the Elkins Family Counseling Center , where Plaintiff was treated by Dr. Chandran from July 18, 2002, to May 17, 2004 (R. 664, 668). During this time period Dr. Chandran treated, examined, evaluated Plaintiff on the following dates: August 30, 2002; October 17, 2002; November 14, 2002; December 27, 2002; February 6, 2003; March 20, 2003; May 9, 2003; June 26, 2003; and May 10, 2004 (586-601, 648, 649, 650-52, 657, 658, 662, 663, 678). The ALJ, himself, noted that the "pattern seem[ed] to be that Dr. Chandran saw the claimant about every four to six weeks . . ." (R. 26).

20 C.F.R. § 404.1527 reads:

> (d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained

from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

> (3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

> (4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

In August, 2002, Dr. Chandran found Plaintiff had marked limitations in her activities of

daily living, ability to maintain social functioning, and ability to maintain concentration, persistence,

or pace, had experienced three episodes of decompensation, and met Listing 12.04 and 12.06 (R. 26, 591, 601). Plaintiff argues that the "opinions of Dr. Chandran [were] ... supported by medically accepted clinical psychiatric interview techniques and the center's administration of medically accepted standardized screening instruments . . . ." (Plaintiff's brief at p. 11.) The ALJ noted the opinions of Dr. Chandran relative to Plaintiff's functional limitations were made on Plaintiff's second visit to him and were made without his conducting "tests of concentration, pace, memory or the like." The ALJ found Dr. Chandran's diagnoses were based on his treating Plaintiff "every four to six weeks, listen[ing] to her subjective complaints, believ[ing] them all, and diagnos[ing] the claimant accordingly." The ALJ further found that a "psychiatrist may feel obligated to believe everything that a claimant says without question or reservation, the undersigned does not." This finding comports with the analysis required in the Ruling and is also supported by the record (R. 26).

The record of evidence shows Dr. Chandran did not conduct any mental evaluation testing of Plaintiff in his treatment and evaluation of Plaintiff. On July 18, 2002; August 30, 2002; October 17, 2002; November 14, 2002; December 27, 2002; February 6, 2003; May 9, 2003; June 26, 2003; and May 17, 2004, Dr. Chandran completed documents which were titled "Pharmacological Management" forms. On these forms were listed Plaintiff's current medications, her subjective complaints, Dr. Chandran's objective observations based on those complaints, and his assessments and plans. No where on the "Pharmacological Management" forms were there noted the results of any mental health tests administered to Plaintiff by Dr. Chandran (R. 648, 649, 657, 658, 659, 662, 663 ,664, 668). On March 20, 2003, Dr. Chandran completed a Psychiatric Evaluation of Plaintiff; it contained no documentation that any mental, depression, or intelligence testings were conducted of Plaintiff (R. 650-52). The ALJ noted there was "no possible way that the doctor could know

42

about the claimant's daily activities or social functioning other than through her own subjective statements . . ." (R. 26). The ALJ examined "the kinds and extent of examinations and testing" conducted by Plaintiff's treating psychiatrist and his finding that "no tests" were conducted on which Dr. Chandran based his findings is well supported. (*See* 20 C.F.R. §404.1527(d)(2)(ii).)

Additionally, the ALJ addressed the supportability of Dr. Chandran's opinion. The ALJ noted Dr. Chandran relied on Plaintiff's reports of feeling "overwhelmed," difficulty in "coping with 'difficult situations,'" of "'being stressed'" and of other subjective complaints in formulating his medical opinion of Plaintiff's conditions (R. 25-26). The ALJ opined that "Dr. Chandran [was] quite sympathetic towards the claimant, which necessarily affect[ed] his objectivity . . ." (R. 26). Plaintiff's subjective complaints are not "relevant evidence . . . particularly medical signs and laboratory tests" that supported Dr. Chandran's opinion. "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

The ALJ's finding that Dr. Chandran's opinions were inconsistent with other substantial evidence, specifically, his own, is supported by the recorded. The evaluators at Underwood & Associates opined Plaintiff did not meet a listing and had several limitations that were "slight," but none more severe than "moderate" (R. 25). Additionally, Dr. Chandran's August 30, 2002, findings that Plaintiff had marked functional limitations, episodes of decompensation, and met listings were not supported by his own treatment notes. Also in his August 30, 2002, report, he found that Plaintiff's anxiety disorder included motor tension, autonomic hyperactivity, apprehensive expectation, and vigilance and scanning symptoms (R. 596). He found Plaintiff's depression symptoms included thoughts of suicide (R. 594). In each of the "Pharmacological Management"

43

forms completed by Dr. Chandran, however, he noted Plaintiff was alert and oriented, her speech was spontaneous, her mood was dysthymic, she had no suicidal or homicidal plans, and her affect was restricted. He also noted she had no other thought symptoms. These findings, which were made from July, 2002, through May, 2004, and do not support the August 30, 2002, opinion expressed by Dr. Chandran. The undersigned finds the ALJ did not err in his analysis of the treating psychiatrist's opinions and utilized the correct regulatory factors in evaluating Dr. Chandran's opinion.

The ALJ conducted a thorough and accurate evaluation of Plaintiff's depression and anxiety symptoms under Section 12.00, Appendix 1. Within the "B" criteria, the ALJ found Plaintiff had moderate limitations in her activities of daily living; mild limitation in her social functioning; no limitations in her concentration, persistence, and pace; and no episodes of decompensation. The ALJ found Plaintiff did not satisfy the "C" criteria of either 12.04 or 12.06 (R. 21-23).

Finally, Plaintiff argues that Underwood & Associates were not treating psychologists, but the ALJ recognized them as such. In his opinion, the ALJ found the following: " The ALJ believes that the Underwood psychologists, who treated the claimant for almost three years, are far more objective than Dr. Chandran and gives their conclusions great weight" (R. 26). A review of the record reveals that Plaintiff was evaluated by Wilda Posey, M.A., Supervised Psychologist, and Rosetta Underwood, M.A., Ed.D., Licensed Psychologist, on June 24 and 25, 2002, upon referral by Montie VanNostrand, Plaintiff's Social Security lawyer, "to assist with [her] Social Security disability claim" (R. 546). Subsequent to that evaluation, Ms. Posey and Dr. Underwood completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Work-Related Abilities of Plaintiff on July 18, 2002 (R. 557-75). The evaluation and assessments made of Plaintiff by Ms. Posey and Dr. Underwood were consultative, not treating. Plaintiff was not

44

treated for three years at Underwood & Associates. In his decision, the ALJ could have given

significant weight to the opinions of Ms. Posey and Dr. Underwood and could have made a finding

based on the weight he assigned to the June, 2002, consultative evaluation and the July, 2002,

consultative assessments; however, the ALJ expressly found Underwood & Associate treated

Plaintiff for "three years" (R. 26). Based upon the "great weight" afforded the opinions of

Underwood & Associates due to the ALJ's finding that Plaintiff had been treated by that organization

for three years, the undersigned does not know if the ALJ would have given great weight to those

opinions if he had correctly identified them as consultative and not as psychologists who had treated

Plaintiff for three years. The undersigned finds the ALJ's assignment of "great weight" to the

opinions of Ms. Posey and Dr. Underwood is not supported by substantial evidence.

### D. Treating Physician

Plaintiff contends the ALJ mischaracterized the medical records of Dr. Khan, failed to uphold

his medical opinions, and failed, without adequate explanation, to include his limitations in the RFC.

Defendant argues substantial evidence supports the Commissioner's decision that Plaintiff retained

the RFC to perform sedentary work. Specifically, Plaintiff asserts the ALJ made "no real effort . .

. to evaluate the 'Medical Opinions' of Dr. Khan . . . using the factors set out in 20 CFR 404.427(d)

(sic).[2] Pursuant to Coffman, supra, there is no substantial support for the ALJ's findings."

(Plaintiff's brief at p. 14.)

As noted above, 20 C.F.R. 1527(d) provides that medical opinions will be weighed.

---

[2]After a thorough reading of Plaintiff's entire argument, the undersigned determined Plaintiff erroneously cited 20 C.F.R. 404.427(d) instead of 20 C.F.R. 1527(d) at this point in her argument. 20 C.F.R. 404.427(d) does not exist; 20 C.F.R. 1527 is that Regulation that addresses the evaluation of opinion evidence.

Succinctly put, more weight will be given to an examining source than to a source who is non-examining; more weight is generally given to treating sources; the longer a source has treated an individual, the more weight that opinion will be afforded; more weight will be given to a treating source who has more knowledge, based on examinations and tests, of the individual's impairments; more weight will be given to the opinion of a medical source which is supported by medical signs and laboratory findings; more weight will be given to opinions that are consistent with the record as a whole; and more weight is generally provided to a specialist.

There is no dispute that Dr. Khan was Plaintiff's treating physician. The record of evidence shows Dr. Khan treated Plaintiff from February, 1996, through July, 2004 (R. 497, 726-31). He treated her for back pain, hypertension, edema, stress, GERD, insomnia, asthma, chest pains, dyspnea, leg pain, neck pain, and headaches, as well as other ailments. Relative to Dr. Khan's medical opinions as to those conditions, the ALJ made the following finding:

> Dr. Khan opined that the claimant was capable of performing sedentary work. (Exhibit 51F/3). I agree with Dr. Khan's assessment in this area. In view of the relatively benign objective medical evidence and the doctor's own notes, the other limitations in his assessment are not persuasive. (Exhibit 51F). In this regard, the ALJ notes that the doctor's treatment notes are largely illegible. From what can be deciphered, however, nothing justifies the drastic limitations that he imposed and the ALJ believes that this doctor is advocating for his patient's disability benefits, as opposed to giving an objective analysis (R. 27).

The undersigned finds the above recited analysis of Dr. Khan's medical opinions was insufficient under the Regulation. The ALJ did not discuss the nature and extent of the treatment relationship between Dr. Khan and Plaintiff. The ALJ did not discuss the relevant evidence, or lack thereof, offered by Dr. Khan to support his opinions. The ALJ did not discuss whether Dr. Khan's opinions were consistent with the record as a whole. Most important, the ALJ neither assigned any weight to the opinions of Dr. Khan as Plaintiff's treating physician nor did he assign any weight to

46

any medical opinions of any consultative or examining physician to support his RFC of Plaintiff.[3]

The ALJ did not assign weight or rely on the September 28, 1999, opinion of Dr. Wiley, who found Plaintiff had lumbar spine sprain and lumbar disc displacement with sciatica and was temporarily totally disabled (R. 303). The ALJ did not give any weight to the February 24, 2000, opinion of Dr. Wiley, whose examination of Plaintiff revealed she had no paraspinal muscle tenderness, spasm, or sacroiliac joint tenderness and who diagnosed lumbar spine sprain and lumbar disc replacement with radiculopathy, and recommended Plaintiff be referred to a pain clinic (R. 287-288). The ALJ failed to weigh the opinion of Dr. Lester, who completed an IME of Plaintiff on August 29, 2000, who found Plaintiff had reached her maximum degree of medical improvement and could return to "modified work" (R. 523). In determining his RFC, the ALJ neither relied on nor assigned weight to the February 24, 2001, consultative examination opinion of Dr. Sabio, who diagnosed hypertensive cardiovascular disease, angina, degenerative disc disease, and chronic back pain (R. 376). The ALJ did not weigh or consider the March 7, August 29, and August 30, 2001, opinions of a state-agency physicians, who reduced Plaintiff's RFC to sedentary (R. 384, 507, 510).

This is not to say that Dr. Khan's opinions or the opinions of the consultative and/or examining physicians are entitled to controlling or any great weight, only that the ALJ's lack of affording weight to any of these opinions is insufficient under the Regulations.

_____

[3]The ALJ made a finding that Plaintiff's degenerative disc disease was not disabling for the reasons set forth in ALJ Levine's October 18, 2002, opinion, and he incorporated ALJ Levine's opinion, relative to that issue, into his December 21, 2004, opinion by reference (R. 24). ALJ Levine discussed the opinions of Dr. Wiley and Dr. Sabio (R. 629-30). He did not assign weight to either opinion. ALJ Levine agreed with the state agency physician's opinion that Plaintiff could perform light work, but found Plaintiff could perform sedentary work. He did not assign weight to that state agency physician's opinion. ALJ Levine did not note on whose medical opinion he relied in determining Plaintiff's RFC.

Except for agreeing with Dr. Khan's assessment that Plaintiff could work at the sedentary level, the ALJ does not base his finding as to Plaintiff's physical RFC on any medical opinion in the record of evidence.

The Fourth Circuit opined in *Gordon v. Schweiker*, 725 F.2d 231 (4th Cir. 1984):

> We cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. *See, e.g., Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980); *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977). As we said in *Arnold*: The courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." 567 F.2d at 259. Neither the ALJ nor the Appeals Council indicated the weight given to the various medical reports submitted by the appellant. We therefore remand to the district court with instructions further to remand the case to the Secretary with directions to the Secretary to reconsider the case and to indicate explicitly the weight accorded to the various medical reports in the record.

Additionally, in *Coffman v. Bowen*, 829 F.2d 514, 517, the Fourth Circuit has found that a "factual finding by ALJ is not binding if it was reached by means of improper standard or misapplication of law." The ALJ's decision that Plaintiff retains the residual functional capacity for sedentary work without assigning weight to or relying on the medical opinion of Plaintiff's treating physician or the opinion of any consultative or examining physician is improper.

For all of the above reasons, the undersigned finds the ALJ decision relative to Dr. Khan's opinion is not supported by substantial evidence.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly

48

recommend Defendant's Motion for Summary Judgment be **DENIED** and the Plaintiff's Motion for Summary Judgment be **GRANTED, in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3) and remanding this case to the Commissioner for further action in accordance with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _11_ day of _June_, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE